ROSELLA NABER, ADMINISTRATRIX OF THE ESTATE OF GLEN NABER, DECEASED, APPELLANT, v. CITY OF HUMBOLDT, NEBRASKA, A MUNICIPAL CORPORATION, APPELLEE.
249 N. W. 2d 726

Filed January 26, 1977. No. 40612.

C. L. Robinson of Fitzgerald, Brown, Leahy, Strom, Schorr & Barmettler and Donald E. Benton, for appellant.

M. J. Bruckner and Richard D. Sievers of Marti, Dalton, Bruckner, O'Gara & Keating, for appellee.

Heard before SPENCER, McCOWN, and NEWTON, JJ., and CANIGLIA and COADY, District Judges.

COADY, District Judge.

This tragedy includes a cast of 3 lifeguards and, at least, 60 persons of minor age. The Humboldt municipal swimming pool opened on Sunday. On the following Friday, June 1, 1973, the pool opened at 1 o'clock, p.m., and approximately 98 children entered the pool in the next 2½ hours according to the pool records. Among

the children attending were Glen Naber, age 10, his younger brother and two younger sisters. They were attending for the first time and were in the charge of a 13-year-old female baby sitter. The baby sitter and the Naber children could not swim.

The pool was 82 feet in length. The width was 40 feet at the center. The north and south sides tapered from the center to each end so that both the east and west ends were 29 feet wide. At the east end there was a separate wading pool. At the west end there were two diving boards, a 1-meter board towards the north, and a 3-meter board towards the south. The west end was overlooked by a high, steel lifeguard chair located on the south side of the pool and approximately at the center of the diving area. That chair was unoccupied. There was a second high, steel lifeguard chair on the south side near the center of the pool which was occupied. From that position a guard could see the entire pool, including the bottom of the diving portion. On the north side, there was a building containing the pool entrance, bath-house, and office.

The pool was cleared of swimmers at 3 o'clock p.m., and remained closed for 15 minutes. At that time, a 52-year old lifeguard-operator testified that she visually checked the bottom of the pool. This lifeguard was the pool manager or operator and will be hereinafter referred to as the operator. After the 3 o'clock break, a 17-year-old female lifeguard took a mobile position, called walk-ing duty, on the north side of the pool and will herein-after be referred to as the north guard. A 21-year-old female lifeguard climbed and seated herself in the chair located at the center of the pool and on the south side. She will hereinafter be referred to as the south guard. The operator had a senior Red Cross life saving certifi-cate and a pool operator's certificate from the State of Nebraska. Both the north and south guards were hold-ers of the Red Cross senior life saving certificate.

At approximately 3:15 o'clock p.m., the break was

ended and the children resumed swimming. Sometime thereafter, the operator adjusted an umbrella above and for the south guard so that the south guard need not take her eyes from the pool. The brother and sisters of Glen Naber were located in the wading pool and being supervised by their baby sitter. Marty, an 11-year-old boy, was located at the bottom of the 3-meter diving board where he let Glen Naber climb ahead of him. At the top, Glen inquired as to the depth and let Marty go ahead of him after being told. Marty jumped off the board and into the pool.

Marty climbed the high board a second time. From the board he looked over the diving area in front of him and saw what he thought was someone near the drain and under 10 to 12 feet of water. He jumped off and climbed out on the south side of the pool near the unoccupied lifeguard chair. He told his 10-year-old friend, Steve, who dove twice from poolside to determine if it really was someone.

The boys told the operator and the south guard. The operator and the south guard yelled to the north guard then located near the northeast corner of the diving area. The north guard dove, retrieved the body of Glen Naber, and brought it to the south side. After yelling to the north guard, yelling to the office for a doctor to be called, and seeing the body brought up, the operator went to the office to complete the emergency call.

The south guard lifted the boy from the water and laid him on his back. The guards looked for signs of life and, finding none, completed one push or stroke of the chest pressure method of artificial respiration. The operator returned and applied six or seven movements of the back pressure arm lift method. A medical doctor arrived after driving 5 or 6 blocks on a motorcycle. He checked for vital signs and he ordered the operator to apply mouth to mouth respiration. She administered four or five breaths at which time the emergency squad arrived with oxygen. All these events were reported

by the witnesses to have happened in terms of seconds. In any case, Glen Naber's body was not revived.

This is an action brought under the Nebraska Political Subdivisions Tort Claims Act to recover damages by reason of negligence. On trial to the court, judgment was entered for the defendant. We affirm the judgment of the District Court.

Plaintiff argues that the lifeguards were inattentive. There was evidence that the guards were attentive and watchful. There was evidence that the deceased acted in such a way that his act should have been noticed and caused alarm. The trial judge specifically stated that he did not believe the principal sources of this latter evidence and set forth adequate reasons.

Plaintiff argues that the guards should have immediately used mouth to mouth respiration. A reader of the bill of exceptions will have no good idea as to whether anything could have been done for the deceased when his body was pulled from the pool. We concede that time is critical in lifesaving. There was evidence that the mouth to mouth approach is the preferred method. There was evidence that the methods first applied were standard and acceptable methods. There was evidence that foam, mucus, and blood came from the mouth of this poor boy.

Because negligence is relative and the plaintiff has the burden of proof, the findings of the trial court will not be disturbed. On appeal to this court of an action under the Political Subdivisions Tort Claims Act, the findings of a trial court will not be disturbed unless clearly wrong. Buttner v. Omaha P. P. Dist., 193 Neb. 515, 227 N. W. 2d 862 (1975).

AFFIRMED.